1

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email: ndeckant@bursor.com
         slitteral@bursor.com

2

3

4

5

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
Gary M. Klinger (*pro hac vice*)
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*gklinger@milberg.com*

6

7

8

9

10

*Attorneys for Plaintiffs*

11

12

13

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

14

15

16

17

18

19

20

21

22

ERIC WADE, KRISTOPHER PACHECO,
QUINN HAINE, and MARLON SIGUENZA,
individually and on behalf of all others similarly
situated,

                    Plaintiffs,

        v.

ONEPLUS USA CORP.

                    Defendant.

Case No. 5:21-cv-05811-BLF

**SECOND AMENDED CLASS**
**ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

23

24

25

26

27

28

Plaintiffs Eric Wade, Kristopher Pacheco, Quinn Haine, and Marlon Siguenza, (collectively, "Plaintiffs") bring this class action suit individually and on behalf of all others similarly situated against Defendant OnePlus USA Corp. ("OnePlus" or "Defendant") for the design, manufacturing, marketing, and sale of the OnePlus 9 and OnePlus 9 Pro smartphones.  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action suit against Defendant for the design, manufacturing, marketing, and sale of the OnePlus 9 and OnePlus 9 Pro smartphones (the "Devices").  Plaintiffs allege that the Devices at issue contain a "Secret Setting," which OnePlus acknowledged was installed following the launch of the OnePlus 9 and 9 Pro,[1] that restricts—or "throttles"—access to the Devices' processing power and other resources.  Specifically, benchmark applications are set to receive full access to the Devices' resources, so that the Devices will appear to run at full power under test conditions, but real-world applications will receive throttled and reduced performance. According to Andrei Frumusanu, the researcher with the publication AnandTech responsible for detecting the Secret Setting, this throttling not only applies to "a handful of apps, but applies to pretty much everything that has any level of popularity in the Google's Play App Store, including the whole of Google's app suite, all of Microsoft's Office apps, all popular social media apps, and any popular browser such as Firefox, Samsung Internet, or Microsoft Edge."[2]  As such, there exists "a large disconnect between the performance that's exhibited in the most popular applications out there and the experience that users will be having within the most popular applications on the market."[3]  Since 2013, Defendant has made tremendous strides to become a globally recognized smartphone brand

---

[1] Sattelberg, "OnePlus confirms it throttled the performance of 300 popular apps." (last accessed September 26, 2022).

[2] Andrei Frumusanu, "Examining OnePlus' Performance Behavior: Optimization or Misrepresentation?"  *AnandTech* (July 6, 2021), https://www.anandtech.com/show/16794/oneplus-9-performance-examination (last accessed Oct. 5, 2021).

[3] *Id.*

with a "cult-like following" comparable to the likes of Apple and Samsung.  Once limited to being an online-only and invite-only brand, Defendant has quickly expanded its offerings and has released an average of at least two new cellular devices per year.  Defendant's early offerings were dubbed "flagship killers" because of their combination of design, powerful specifications, fast and lean software, and a low price.

2.       As a part of the March 23, 2021 launch for the OnePlus 9 and 9 Pro smartphones, the company rebranded, informing customers that "[w]e are fueled by the words 'Never Settle,' disrupting the status quo to bring premium devices to North America that is in reach of more consumers."  To that effect, Defendant claims on its website that: "We continue to push the boundaries of what's possible.  Pulling the industry forward since our founding, we will Never Settle in delivering innovative capabilities to improve consumers lives."  In doing so, Defendant claims that it is "community driven" because "we work[] with our OnePlus community members, we listen to what you want and need, and develop products built for you, by you."

3.       However, despite these promises, Defendant has engaged in secretly "throttling" the performance of apps on its phones (hereafter, "the Defect").  That is, post-launch Defendant installed in its OnePlus 9 and OnePlus 9 Pro smartphones programming to limit access to their fastest processing cores for a number of popular applications, including, as described below, several of those Plaintiffs themselves use, causing slowdown in typical workloads such as web browsing and gaming.  According to Mr. Frumusanu's study—the results of which have been confirmed by several independent sources as described below—Defendant gives "benchmark applications" full performance—so that the phones appear to run at full speed when tested and measured—while commonly-used applications are secretly configured for significantly reduced performance and pushed to the smaller cores of OnePlus' processor, the Snapdragon 888 (the "Processor").  In turn, Defendant can advertise its Devices as achieving significant speeds and high-level performance.

4.       Mr. Frumusanu's study focused on the Chrome and Twitter apps for the OnePlus 9 and OnePlus 9 Pro smartphones, which showed significantly reduced performance in a number of independent benchmark programs – which are indicative and probative of real-world performance.

In addition, Mr. Frumusanu's research further confirmed that the throttling caused by the Secret Setting applies to the following apps (among many others), each of which is similarly impacted by reduced performance in both benchmark and real-world usage: Microsoft Word, Microsoft Excel, Microsoft Outlook, Microsoft Teams, DropBox, Amazon Shopping, Pokemon Go, Uber, Uber Eats, Adobe Reader, Strava, Twitch, Facebook, Discord, LinkedIn, Netflix, VLC, Candy Crush, AirBNB, WhatsApp, Zoom, Instagram, SnapChat, TikTok, YouTube, Mozilla FireFox, and Reddit. The throttling also affected the OnePlus 9 and OnePlus 9 Pro's built-in settings, launcher, forums, weather, file manager, gallery, and camera applications. Further, in his report, Mr. Frumusanu states that this list is not exhaustive.

5.     Consequently, consumers have been led to believe, based on Defendant's representations, that the Devices are much faster and more powerful than they actually perform. To further this deception, Defendant maintains a Secret Setting that allows it to choose which applications receive priority. This means that in light of the Defect, consumers are not getting the full advertised performance of their phones, paying a significant price premium for characteristics—*i.e.*, speed, power, and performance—that they are not receiving.

6.     Plaintiffs bring their claims against Defendant individually and on behalf of a Class of all other similarly situated purchasers of the OnePlus 9 and 9 Pro for: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(5); (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.; (4) violation of California's Computer Data Access and Fraud Act ("CCDFA"), Cal. Penal Code § 502; (5) trespass to chattels; (6) fraud; (7) fraudulent omission or concealment; (8) negligent misrepresentation; and (9) quasi-contract / unjust enrichment.

## PARTIES

7.     Plaintiff Eric Wade is, and at all times relevant to this action has been, a citizen of California and a resident of San Jose. In June 2021, Plaintiff Wade purchased his OnePlus 9 Pro in San Jose, California. Prior to his purchase of the Device, Plaintiff Wade thoroughly researched the

OnePlus 9 Pro.  In doing so, Plaintiff Wade reviewed OnePlus' website, containing the marketing material as set forth below.  Of particular importance to Plaintiff Wade's decision to purchase the OnePlus 9 Pro was OnePlus' advertising of the Device specifications.  Plaintiff Wade appreciated that the Device was made with a newly revamped Snapdragon 888 processor (the "Processor") that would purportedly efficiently allocate multiple tasks across its several cores, allowing it to achieve a purported 25% performance boost.  Plaintiff Wade purchased the phone in reliance on these and other representations in the context concerning the Devices' "ultimate performance" and "unprecedented power."  Plaintiff Wade would not have purchased the Device had he known that OnePlus would secretly access his Device without his permission, thereby restraining his Device's performance and limiting the use of the Processor's most powerful cores.  Plaintiff Wade would also not have purchased his Device if he had known that OnePlus' trespass would cause his Device to perform slower on key benchmarks than OnePlus' previous models, the 8 and 8 Pro, and that numerous of his favorite applications would similarly experience slowed performance.  For example, Plaintiff Wade used the Google Chrome web browser as the primary application for accessing the internet.  Among the other applications that Plaintiff Wade used were:

- Zoom;
- WhatsApp;
- Facebook;
- TikTok;
- Instagram;
- Snapchat;
- YouTube;
- LinkedIn;
- Reddit;
- Twitter;
- Netflix;
- Candy Crush Saga;

1

- Uber;

2

- Uber Eats; and

3

- Microsoft Office.

4      8.      Additionally, Plaintiff Wade has relied on several of OnePlus' applications which are

5  also throttled, including: settings, launcher, forums, weather, file manager, gallery, and camera.  Each

6  of these applications, which Plaintiff Wade accessed while using his OnePlus 9, were subject to

7  throttling by OnePlus[4] and Plaintiff Wade experienced reduced performance while using each of

8  these applications.  At the time of his purchase, Plaintiff Wade did not know, nor could he have

9  reasonably known, of the conduct complained of herein.  Additionally, none of the packaging in

10  which the Device was sold revealed that Defendant would use its Secret Setting to "throttle" or

11  otherwise regulate the speed pursuant to which Plaintiff's Device would operate.  In fact, OnePlus

12  did not publicly acknowledge that it had secretly accessed Plaintiff Wade's and others' Devices until

13  July 7, 2021—well after Plaintiff Wade made his purchase.  Accordingly, Plaintiff Wade did not get

14  the benefit of his bargain as the Device he purchased did not operate as OnePlus warranted and

15  promised in its advertisements, representations, and the information publicly available in the

16  marketplace.  If Plaintiff had been told of the post-launch update that created the Defect and the

17  deceptive manner in which Defendant would conceal this Defect, Plaintiff would not have purchased

18  his Device, or would have paid substantially less.  Despite being deceived, Plaintiff Wade wishes to

19  and is likely to continue purchasing and using Defendant's cellular devices, provided that Defendant

20  foregoes future throttling.  Although Plaintiff Wade regularly visits stores and online retailers that

21  carry Defendant's devices, because Plaintiff Wade was deceived in the past by Defendant, absent an

22  injunction, he will be unable to rely with confidence on whether Defendant's devices will be subject

23  to throttling.  Therefore, Plaintiff Wade will abstain from purchasing Defendant's devices even

24  though he would like to do so in the future.  In addition, members of the proposed classes run the

25  risk of continuing to purchase Defendant's devices under the faulty assumption that they will not be

26

27  [4] *See* https://www.anandtech.com/show/16794/oneplus-9-performance-examination/?utm_source=twitter&utm_campaign=socialflow&utm_medium=social (last accessed

28  September 26, 2022).

1    subject to throttling.  Until Defendant is enjoined from its deceptive practices, Plaintiff Wade and
2    other consumers will continue to bear this ongoing injury.

3         9.    Moreover, equitable relief is appropriate because Plaintiff Wade may lack an
4    adequate remedy at law if, for instance, damages resulting from his purchase of the Product is
5    determined to be an amount less than the premium price of the Product.  Without compensation for
6    the full premium price of the Product, Plaintiff would be left without the parity in purchasing power
7    to which he is entitled.  Restitution and/or injunctive relief may also be more certain, prompt, and
8    efficient than other legal remedies requested herein.

9         10.   Plaintiff Kristopher Pacheco is, and at all times relevant to this action has been, a
10   citizen of California and a resident of Torrance.  In June 2021, Plaintiff Pacheco purchased his
11   OnePlus 9 Pro in Torrance, California.  Prior to his purchase of the Device, Plaintiff Pacheco
12   thoroughly researched the OnePlus 9 Pro.  In doing so, Plaintiff Pacheco reviewed OnePlus' website,
13   containing the marketing material as set forth below.  Of particular importance to Plaintiff Pacheco's
14   decision to purchase the OnePlus 9 Pro was OnePlus' advertising of the Device specifications.
15   Plaintiff Pacheco appreciated that the Device was made with a newly revamped Processor that would
16   purportedly efficiently allocate multiple tasks across its several cores, allowing it to achieve a
17   purported 25% performance boost.  Plaintiff Pacheco purchased the phone in reliance on these and
18   other representations in the context concerning the Devices' "ultimate performance" and
19   "unprecedented power."  Plaintiff Pacheco would not have purchased the Device had he known that
20   OnePlus would secretly access his Device without his permission through its post-launch update,
21   thereby restraining his Device's performance and limiting the use of the Processor's most powerful
22   cores.  Plaintiff Pacheco would also not have purchased his Device if he had known that OnePlus'
23   trespass would cause his Device to perform slower on key benchmarks than OnePlus' previous
24   models, the 8 and 8 Pro, and that numerous of his favorite applications would similarly experience
25   slowed performance.  For example, Plaintiff Pacheco used the Google Chrome web browser as the
26   primary application for accessing the internet.  Among the other applications that Plaintiff Pacheco
27   used were:

28

1

2

3

4

5

6

7

8

9

10

11

12

- Zoom;

- WhatsApp;

- YouTube;

- Amazon Shopping;

- DropBox;

- Mozilla Firefox;

- Netflix;

- LinkedIn;

- Adobe Reader;

- Reddit;

- Uber; and

- Uber Eats.

13   11.   Additionally, Plaintiff Pacheco has relied on several of OnePlus' applications which

14  are also throttled, including: settings, launcher, forums, weather, file manager, gallery, and camera.

15  Each of these applications, which Plaintiff Pacheco accessed while using his OnePlus 9, were subject

16  to throttling by OnePlus[5] and Plaintiff Pacheco experienced reduced performance while using each

17  of these applications.  At the time of his purchase, Plaintiff Pacheco did not know, nor could he have

18  reasonably known, of the conduct complained of herein.  Additionally, none of the packaging in

19  which the Device was sold revealed that Defendant would use its Secret Setting to "throttle" or

20  otherwise regulate the speed pursuant to which Plaintiff's Device would operate.  In fact, OnePlus

21  did not publicly acknowledge that it had secretly accessed Plaintiff Pacheco's and others' Devices

22  until July 7, 2021—well after Plaintiff Pacheco made his purchase.  Accordingly, Plaintiff Pacheco

23  did not get the benefit of his bargain as the Device he purchased did not operate as OnePlus warranted

24  and promised in its advertisements, representations, and the information publicly available in the

25  marketplace.  If Plaintiff had been told of the post-launch update that created the Defect and the

26

27

28

---

[5] *See* https://www.anandtech.com/show/16794/oneplus-9-performance-examination/?utm_source=twitter&utm_campaign=socialflow&utm_medium=social (last accessed September 26, 2022).

deceptive manner in which Defendant would conceal this Defect, Plaintiff would not have purchased his Device, or would have paid substantially less.  Despite being deceived, Plaintiff Pacheco wishes to and is likely to continue purchasing and using Defendant's cellular devices, provided that Defendant foregoes future throttling.  Although Plaintiff Pacheco regularly visits stores and online retailers that carry Defendant's devices, because Plaintiff Pacheco was deceived in the past by Defendant, absent an injunction, he will be unable to rely with confidence on whether Defendant's devices will be subject to throttling.  Therefore, Plaintiff Pacheco will abstain from purchasing Defendant's devices even though he would like to do so in the future.  In addition, member of the proposed classes run the risk of continuing to purchase Defendant's devices under the faulty assumption that they will not be subject to throttling.  Until Defendant is enjoined from its deceptive practices, Plaintiff Pacheco and other consumers will continue to bear this ongoing injury.

12.     Moreover, equitable relief is appropriate because Plaintiff Pacheco may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.  Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.

13.     Plaintiff Quinn Haine is, and at all times relevant to this action has been, a citizen of California and a resident of San Bernadino County.  In April 2021, Plaintiff Haine purchased his OnePlus 9 online in San Bernadino, California.  Prior to his purchase of the Device, Plaintiff Haine thoroughly researched the OnePlus 9.  In doing so, Plaintiff Haine reviewed OnePlus' website, containing the marketing material as set forth below.  Of particular importance to Plaintiff Haine's decision to purchase the OnePlus 9 was OnePlus' advertising of the Device specifications.  Plaintiff Haine appreciated that the Device was made with a newly revamped Processor that would purportedly efficiently allocate multiple tasks across its several cores, allowing it to achieve a purported 25% performance boost.  Plaintiff Haine purchased the phone in reliance on these and other representations in the context concerning the Devices' "ultimate performance" and

"unprecedented power."  Plaintiff Haine would not have purchased the Device had he known that OnePlus would secretly access his Device without his permission through its post-launch update, thereby restraining his Device's performance and limiting the use of the Processor's most powerful cores.  Plaintiff Haine would also not have purchased his Device if he had known that OnePlus' trespass would cause his Device to perform slower on key benchmarks than OnePlus' previous models, the 8 and 8 Pro, and that numerous of his favorite applications would similarly experience slowed performance.  For example, Plaintiff Haine used the Google Chrome web browser as the primary application for accessing the internet.  Among the other applications that Plaintiff Haine used were:

- Google Maps
- Facebook;
- YouTube;
- WhatsApp;
- Amazon Shopping;
- Instagram; and
- Snapchat.

14.     Additionally, Plaintiff Haine has relied on several of OnePlus' applications which are also throttled, including: settings, launcher, forums, weather, file manager, gallery, and camera.  Each of these applications, which Plaintiff Haine accessed while using his OnePlus 9, were subject to throttling by OnePlus[6] and Plaintiff Haine experienced reduced performance while using each of these applications.  At the time of his purchase, Plaintiff Haine did not know, nor could he have reasonably known, of the conduct complained of herein. Additionally, none of the packaging in which the Device was sold revealed that Defendant would use its Secret Setting to "throttle" or otherwise regulate the speed pursuant to which Plaintiff's Device would operate.  In fact, OnePlus did not publicly acknowledge that it had secretly accessed Plaintiff Haine's and others' Devices until

---

[6] *See* https://www.anandtech.com/show/16794/oneplus-9-performance-examination/?utm_source=twitter&utm_campaign=socialflow&utm_medium=social (last accessed September 26, 2022).

July 7, 2021—well after Plaintiff Haine made his purchase.  Accordingly, Plaintiff Haine did not get the benefit of his bargain as the Device he purchased did not operate as OnePlus warranted and promised in its advertisements, representations, and the information publicly available in the marketplace.  If Plaintiff had been told of the post-launch update that created the Defect and the deceptive manner in which Defendant would conceal this Defect, Plaintiff would not have purchased his Device, or would have paid substantially less.  Despite being deceived, Plaintiff Haine wishes to and is likely to continue purchasing and using Defendant's cellular devices, provided that Defendant foregoes future throttling.  Although Plaintiff Haine regularly visits stores and online retailers that carry Defendant's devices, because Plaintiff Haine was deceived in the past by Defendant, absent an injunction, he will be unable to rely with confidence on whether Defendant's devices will be subject to throttling.  Therefore, Plaintiff Haine will abstain from purchasing Defendant's devices even though he would like to do so in the future.  In addition, member of the proposed classes run the risk of continuing to purchase Defendant's devices under the faulty assumption that they will not be subject to throttling.  Until Defendant is enjoined from its deceptive practices, Plaintiff Haine and other consumers will continue to bear this ongoing injury.

15.     Moreover, equitable relief is appropriate because Plaintiff Haine may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.  Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.

16.     Plaintiff Marlon Siguenza is, and at all times relevant to this action has been, a citizen of California and a resident of Los Angeles County.  In February 2021, Plaintiff Siguenza purchased his OnePlus 9 Pro online in Santa Monica, California.  Prior to his purchase of the Device, Plaintiff Siguenza thoroughly researched the OnePlus 9 Pro.  In doing so, Plaintiff Siguenza reviewed OnePlus' website, containing the marketing material as set forth below.  Of particular importance to Plaintiff Siguenza's decision to purchase the OnePlus 9 Pro was OnePlus' advertising of the Device

specifications.   Plaintiff Siguenza appreciated that the Device was made with a newly revamped Processor that would purportedly efficiently allocate multiple tasks across its several cores, allowing it to achieve a purported 25% performance boost.  Plaintiff Siguenza purchased the phone in reliance on these and other representations in the context concerning the Devices' "ultimate performance" and "unprecedented power."  Plaintiff Siguenza would not have purchased the Device had he known that OnePlus would secretly access his Device without his permission through its post-launch update, thereby restraining his Device's performance and limiting the use of the Processor's most powerful cores.  Plaintiff Siguenza would also not have purchased his Device if he had known that OnePlus' trespass would cause his Device to perform slower on key benchmarks than OnePlus' previous models, the 8 and 8 Pro, and that numerous of his favorite applications would similarly experience slowed performance.  For example, Plaintiff Siguenza used the Google Chrome web browser as the primary application for accessing the internet.  Among the other applications that Plaintiff Siguenza used were:

- WhatsApp;
- Facebook;
- Amazon Shopping;
- Instagram;
- Twitter;
- Uber Eats; and
- Netflix

17.    Additionally, Plaintiff Siguenza has relied on several of OnePlus' applications which are also throttled, including: settings, launcher, forums, weather, file manager, gallery, and camera. Each of these applications, which Plaintiff Siguenza accessed while using his OnePlus 9, were subject to throttling by OnePlus[7] and Plaintiff Siguenza experienced reduced performance while using each of these applications.  At the time of his purchase, Plaintiff Siguenza did not know, nor

---

[7] *See* https://www.anandtech.com/show/16794/oneplus-9-performance-examination/?utm_source=twitter&utm_campaign=socialflow&utm_medium=social (last accessed September 26, 2022).

could he have reasonably known, of the conduct complained of herein. Additionally, none of the packaging in which the Device was sold revealed that Defendant would use its Secret Setting to "throttle" or otherwise regulate the speed pursuant to which Plaintiff's Device would operate. In fact, OnePlus did not publicly acknowledge that it had secretly accessed Plaintiff Siguenza's and others' Devices until July 7, 2021—well after Plaintiff Siguenza made his purchase. Accordingly, Plaintiff Siguenza did not get the benefit of his bargain as the Device he purchased did not operate as OnePlus warranted and promised in its advertisements, representations, and the information publicly available in the marketplace. If Plaintiff had been told of the post-launch update that created the Defect and the deceptive manner in which Defendant would conceal this Defect, Plaintiff would not have purchased his Device, or would have paid substantially less. Despite being deceived, Plaintiff Siguenza wishes to and is likely to continue purchasing and using Defendant's cellular devices, provided that Defendant foregoes future throttling. Although Plaintiff Siguenza regularly visits stores and online retailers that carry Defendant's devices, because Plaintiff Siguenza was deceived in the past by Defendant, absent an injunction, he will be unable to rely with confidence on whether Defendant's devices will be subject to throttling. Therefore, Plaintiff Siguenza will abstain from purchasing Defendant's devices even though he would like to do so in the future. In addition, member of the proposed classes run the risk of continuing to purchase Defendant's devices under the faulty assumption that they will not be subject to throttling. Until Defendant is enjoined from its deceptive practices, Plaintiff Siguenza and other consumers will continue to bear this ongoing injury.

18.     Moreover, equitable relief is appropriate because Plaintiff Siguenza may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled. Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.

19.     OnePlus USA Corp. is a corporation organized under the laws of Nevada, having a principal place of business at 5000 Riverside Drive, Suite 300, Irving, Texas, 75039-4314.

1

**JURISDICTION AND VENUE**

2    20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

3    1332(d) because there are more than 100 class members and the aggregate amount in controversy

4    exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a

5    citizen of a state different from Defendant.

6    21.    This Court has personal jurisdiction over Defendant because Defendant purposefully

7    availed itself of this forum by conducting substantial business within California such that Defendant

8    has significant, continuous, and pervasive contacts with the State of California.  Further, a substantial

9    part of the events giving rise to Plaintiffs' claims took place within this District, as certain of the

10   Plaintiffs purchased their Devices in this District and are citizens and residents of this District.

11   22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does

12   substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims

13   took place within this District, as certain of the Plaintiffs purchased their Devices in this District and

14   are citizens and residents of this District.

15                              **FACTUAL ALLEGATIONS**

16   **A.    OnePlus' Rise And The Launch Of The OnePlus 9 and 9 Pro**

17   23.    Defendant has established itself as a dominant participant in the U.S. smartphone

18   market.  In 2020, OnePlus was the only major brand to grow year-on-year, seeing sell-through / sales

19   growth of 163% compared to 2019.  Its competitors, Apple and Samsung, on the other hand, saw

20   year-on-year declines of 3% and 5%, respectively.  According to one expert, "[t]he main reason that

21   the OnePlus brand has grown as much as it has is that it doesn't cut corners.  Unlike other mobile

22   providers they aren't expecting consumers to pay more for less—they relay their cheaper production

23   costs onto the consumer whilst delivering great quality."  This is an important reason Plaintiffs felt

24   comfortable purchasing their Devices through OnePlus.

25   24.    OnePlus is not available for widespread retail sale like iPhones and Androids.[8]

26   OnePlus initially sold its phones through an "invite" system for buying its smartphones – you had to

27   ───────────────
[8] https://www.businessinsider.com/oneplus-phones-vs-apple-iphone-samsung-galaxy-s-2019-4 (last
28   access September 26, 2022).

sign up to receive an invite to purchase the phone.[9]  More recently, OnePlus phones are largely purchased online, rather than in brick-and-mortar retail stores.

25.    In other words, OnePlus phones are built for "phone hobbyists" who prioritize maximum performance from their phones.  In plain English, individuals buy OnePlus-brand phones – as opposed to competitors such as Apple, Samsung, and Google – because they want maximum performance and speed from their devices.  OnePlus phones are not marketed for casual users, but rather hobbyists and power users.

26.    In light of Defendant's growing reputation for affordable excellence, the launch of the OnePlus 9 and 9 Pro was an important development for the company as it sought to establish a seat at the table amongst their biggest competitors.  But to do so, Defendant needed to match Apple and Samsung "both [of which] repeatedly highlight how much faster their processors are" as compared to the competition.  To this end, Defendant sought to establish speed and performance as hallmarks of its growing brand.  In designing the OnePlus 9, Defendant claims that the phone is "Engineered for Speed."  This branding effort is important context to the representation at issue.

27.    Specifically, Defendant claims that: "The signature OnePlus 'Fast and Smooth' experience personifies our Never Settle spirit.   With our fastest ever 5G, ultra-powerful Snapdragon™ 888 CPU and next-gen RAM, uncompromising power has arrived.  Experience the next level of fast and smooth with the OnePlus 9."

---

[9] https://www.techradar.com/news/what-are-oneplus-phones-a-guide-to-the-company-and-its-smartphones (last accessed September 26, 2022).

1

2

3

4

5

6

7

8

9

10

11



28.     As discussed above, OnePlus' emphasis on the "next level" of speed is a significant reason consumers purchased the Device over previous generations of the phone, such as the OnePlus 8 or 8 Pro.  Plaintiffs and other consumers wanted the most advanced technology, offering the most speed and capability as possible.

29.     In explaining the OnePlus 9's "Maximum performance," Defendant further claimed that: "The Qualcomm® Snapdragon™ 888 with 5G is the world's most powerful Snapdragon™ CPU."  The use of the term "Maximum" was yet another indicator to consumers that no other OnePlus device offered the same level of performance as the newly designed Devices.  Defendant's use of the term "Maximum" constitutes an incomplete partial representation.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



## Snapdragon™ 888

Supercharg

## Maximum performance

The Qualcomm® Snapdragon™ 888 with 5G is the world's most powerful Snapdragon™ CPU. Redefining what's possible on smartphones, one prime Cortex-X1 core (2.84 GHz), three Cortex-A78 CPU cores (2.42 GHz), and four energy-efficient Cortex-A55 cores (1.8 GHz) deliver unprecedented power. Built on the leading-edge 5nm (5LPE) process node, 25% higher CPU performance compared to the Snapdragon™ 865 combines with industry-leading efficiency for trailblazing performance that lasts.

## Flagship graphics

The Adreno 660 GPU is paired with the Hexagon™ 780 DSP/NPU (running at 26 TOPS). Featuring 35% faster rendering over the previous generation, the GPU is also more power efficient. With an overall performance uplift, Adreno 660 delivers improved OLED display uniformity, picture quality, and sub-pixel rendering. The architecture also integrates next-gen desktop-level features, including updateable GPU drivers and patches.

15    30.    As a part of this, OnePlus emphasized the Snapdragon's multiple cores, noting that it

16    contains "one prime Cortex-x1 core" which would operate at a full 2.84GHZ, along with "three

17    Cortex-A78 CPU cores" which would operate at a slower 2.42 GHz, and "four energy-efficient

18    Cortex A55 cores" that would operate at a much slower 1.8 GHz.  All in all, these cores, primarily

19    through the use of the main core would provide "25% higher CPU performance compared to the

20    Snapdragon 865" which was housed by OnePlus' 8 and 8 Pro.  Defendant's use of the phrase "25%

21    higher CPU performance" constitutes an incomplete partial representation.

22    31.    According to Defendant, this fast, high-performance device also delivers the

23    consumer the "Power to Play."  That is, Defendant encourages consumers to: "Power your way to

24    victory with the flagship Snapdragon™ 888 with maximum frame rates and low latency."  Defendant

25    further claims that: "We optimized our gaming mode for even smoother gameplay.  With OnePlus,

26    gamers never settle."

27
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14    32.    Defendant also encourages consumers to: "Accelerate your way to victory with a
15  faster, smoother gaming performance.  When milliseconds count, make your ultimate play with the
16  OnePlus 9."  Here, OnePlus acknowledged, yet again, that centrality of speed to the overall user
17  experience.  OnePlus' marketing was never just about the games.  OnePlus' marketing was about
18  creating an ethos or a context that emphasized speed was king and that for consumers who wanted
19  speed, the OnePlus 9 and 9 Pro were for them.

20

21  

22

23

24

25    33.    Defendant's emphasis on power, speed, and performance extends to the OnePlus 9
26  Pro.  Defendant claims that they equipped the 9 Pro with the Qualcomm Snapdragon 888 to deliver
27  "Power on Tap."

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17     34.     Defendant claimed that: "The flawlessly 'Fast and Smooth' experience has come to

18   exemplify OnePlus.  With cutting-edge 5G, it's effortless to stay in the loop without jumping through

19   hoops.  Now with the most powerful Snapdragon™ platform ever, experience what's possible with

20   speed revitalized."  This latter statement that the Devices contain the "most powerful Snapdragon

21   platform ever" is an objective and measurable representation that is capable of being compared to

22   the platform and abilities of OnePlus' previous generation of smart phones.  That statement also

23   constitutes an incomplete partial representation.

24     35.     To Defendant's point, Defendant claims that: "The Qualcomm® Snapdragon™ 888

25   with 5G delivers unprecedented power."  Specifically, "[w]ith one Cortex-X1 core (2.84 GHz) for

26   prime performance, three Cortex-A78 CPU cores (2.42 GHz), and four energy-efficient Cortex-A55

27   cores (1.8 GHz), every aspect of performance is boosted with an overall 25% performance uplift

28

over Snapdragon™ 865."  Defendant's use of "unprecedented power" and "25% performance uplift"

constitutes incomplete partial representations.



36.     The addition of the Snapdragon is an important feature as it relates to Defendant's

marketing of the 9 Pro's gaming capabilities.  Defendant claimed that the "Next-level mobile gaming

arrives with the OnePlus 9 Pro.  The class-leading 120 Hz Fluid Display 2.0 and massive power of

the Qualcomm® Snapdragon™ 888 deliver incredible refresh rates and ultra-low latency.  Optimized

for performance, experience ultra-smooth gameplay.   With OnePlus, gamers never settle."

Noticeably, OnePlus does not qualify which games are capable of being "elevated."  Accordingly,

these statements appeal to gamers who use Google's gaming applications, amongst others.

Importantly, these are applications that were a part of those targeted by OnePlus' efforts to restrain

device performance.   So, gamers using those platforms did not receive the performance that

Defendant promised.

37.     Defendant also equipped the OnePlus 9 and 9 Pro with OxygenOS 11, which is marketed as: "[O]ur uncompromising Never Settle vision dialed up to 11.  Swipe into our most intuitive, personalized smartphone experience.  A bold and seamless fusion of form and function, experience next-level fast and smooth."  Again, OnePlus' emphasis on the "next level" must be placed in its proper context and considered next to its earlier devices, the OnePlus 8 and 8 Pro which OnePlus also marketed as a speedy device: "lead with speed."  Defendant's use of "next level" constitutes an incomplete partial representation.



38.     In other words, Defendant represents that: "Everything has been dialed up to 11: streamline everyday tasks, navigate more efficiently with intuitive gestures to access what's important, and enjoy a more personalized user experience."

39.     As demonstrated, the terms "speed," "power," and "performance" were integral to Defendant's marketing of the OnePlus 9 and 9 Pro.  But this enhanced capability did not come cheaply.  Instead, moving away from the lower prices offered in their early years, Defendant put a premium price tag on the Devices, debuting at $729 for the OnePlus 9 and $969 for the OnePlus 9 Pro.

40.     Because those who purchase OnePlus 9 and 9 Pro phones buy these phones for maximum performance, throttling performance for any reason, including to save battery life, runs contrary to the reason why consumers purchase maximum performance phones like the OnePlus 9 and 9 Pro.  That is, maximum performance and speed are both central to the device and material to consumers' purchasing decisions.

**B.      OnePlus Exposed As A Benchmark Manipulator**

41.      On July 6, 2021, Andrei Frumusanu, Senior Mobile Editor at AnandTech, Inc., released his study of the OnePlus 9 called "Examining OnePlus' Performance Behavior: Optimization or Misrepresentation?"   As a part of this study, Mr. Frumusanu stated that "*benchmarks and performance measurements are a main-stay of evaluation of device and integral parts of the review process for . . . consumers as well as publications or analysts*."  (emphasis added).  Mr. Frumusanu noted that OnePlus' "*performance behavior . . . blurs the line between battery optimization, performance cheating, and general device specification misrepresentation*." (emphasis added).

42.      Mr. Frumusanu explained that during his testing of the OnePlus 9 Pro "I had encountered something which really perplexed me, and caught my attention; seemingly *inexplicable slow browser benchmark figures which were not in line with any other Snapdragon 888 device in the market, getting only a fraction of the scores and performance of other devices*." (emphasis added).  To this point, Mr. Frumusanu added a link to the below photograph that he uploaded to his Twitter account along with the following caption: "Same Snapdragon 888, same Chrome version. [Samsung Galaxy] S21 Ultra [on] top, O[ne]P[lus] 9 Pro [on] bottom."

43.     Particularly remarkable is that both phones—the Samsung Galaxy S21 Ultra and the OnePlus 9 Pro—use the same Snapdragon 888 (the "Processor").  Said simply, "[t]he processor is the central hub of your smartphone.  It receives and executes every command, performing billions of calculations per second.  The effectiveness of the processor directly affects every application you run, whether it's the camera, the music player, or just a simple email program."[10]  The Processor is composed of several components that allows smartphones to operate efficiently, but most importantly here, the Processor includes a Central Processing Unit (the "CPU").  As Qualcomm—the maker of the Processor—notes, "[t]his is the 'brain' of your smartphone."  That is, "[t]he CPU receives commands, makes instant calculations, and sends signals throughout your device."[11]  More CPU is like a bigger, smarter brain that allows the phone to run optimally and intelligently.  This is what OnePlus means when it says the OnePlus 9 and 9 Pro provide "maximum performance" and that the Devices are "engineered for speed."  The state-of-the-art Processor included in the OnePlus 9 and OnePlus 9 Pro is marketed by both Qualcomm and OnePlus as containing 680 CPU.  This is significantly higher than OnePlus' previous generation of its flagship phones the OnePlus 8 and OnePlus 8 Pro that contained a Snapdragon 865 that had only 585 CPU.[12]  As a result of the inclusion of this newly innovated Processor, OnePlus is able to market the OnePlus 9 and OnePlus 9 Pro as achieving "25% higher CPU performance compared to the Snapdragon 865."  In turn, consumers purchasing the OnePlus 9 and OnePlus 9 Pro expect these Devices to run with "maximum performance," just as OnePlus advertises.  However, Mr. Frumusanu's study—as well as others who have consistently replicated his results—proves otherwise, demonstrating that the devices, rather

---

[10]     Qualcomm, "Mobile Processors 101: Why smartphones are smarter with all-in-one processor," *OnQ Blog* (Jun. 13, 2013), https://www.qualcomm.com/news/onq/2013/06/13/mobile-processors-101-why-smartphones-are-smarter-all-one-processor#:~:text=The%20processor%20is%20the%20central,billions%20of%20calculations%20per%20second.&text=The%20ability%20of%20the%20processor,is%20essential%20to%20smooth%20operation (last visited Oct. 5, 2021).

[11]     *Id.*

[12]     *See* OnePlus, "OnePlus 8," https://www.oneplus.com/8 (last visited Oct. 5, 2021); *see also* Qualcomm, Snapdragon 865+ Mobile Platform, https://www.qualcomm.com/products/snapdragon-865-plus-5g-mobile-platform (last visited Oct. 5, 2021).

than performing with "industry-leading efficiency" as advertised, are more akin to an "early-2010's budget device, with horrible performance."

44.    The specifics of Mr. Frumusanu's study are as follows.  Mr. Frumusanu turned to the Speedometer 2.0 which was created by Apple's WebKit team and is an industry standard for measuring performance.   Speedometer 2.0 allows engineers to quantitatively analyze device performance.  Specifically, the test involves adding, completing, and removing items in a to-do list. The registered score "is a geometric mean of the different implementations of the to-do app, and then an arithmetic mean of the geometric means for each iteration."[13]  Said simply, the higher the score the better.  A higher score demonstrates that the Processor is working efficiently and powerfully. Mr. Frumusanu began by running Google's Chrome application.  During the first run, the phone "manag[ed] a score of 61.5 – a low score that's very abnormal for a Snapdragon 888" resulting in the cores "running at only 2GHz instead of their maximum 2.41GHz."  Mr. Frumusanu determined that "when re-running the test immediately again in sequence" the results led to a "horrible score of 16.8."  To put these numbers in context, another researcher through the platform, *Gary Explains*, ran an identical test using both the OnePlus 9 and 9 Pro and the earlier version, the OnePlus 8 and 8 Pro. The OnePlus 8 and 8 Pro achieved a score of 68.8 whereas the OnePlus 9 and 9 Pro achieved a score of only 17.6—hardly the "industry-leading performance" or "unprecedented power" advertised.



---

[13]    Brett Howse, "The 2020 Browser Battle: Surfing With Speed," *AnandTech* (Sept. 10, 2020) https://www.anandtech.com/show/16078/the-2020-browser-battle-surfing-with-speed/2 (last visited Oct. 5, 2021).

45.     To reconcile OnePlus' advertising of the Devices with their actual performance, Mr. Frumusanu began to "investigat[e] the device's OS logs."  In doing so, he "managed to detect a repeatable behavior between applications that behaved . . . weirdly, and those that didn't."  He discovered that OnePlus was not treating "all apps equally" and that it was instead prioritizing applications and slowing other applications down, removing this decision from the hands of its users. In other words, "OnePlus has included a blacklist of popular apps from the Play Store, all of which are prevented from taking full advantage of the phone's power."[14]  To this point, Mr. Frumusanu concluded that:

> What's evident here, is that this is not a mechanism solely applying to a handful of apps, but applies to pretty much everything that has any level of popularity in the [Google] Play Store, including the whole of Google's app suit, all of Microsoft's Office apps, all popular social media apps, and any popular browser such as Firefox, Samsung Internet, or Microsoft Edge.

46.     The reaction to Mr. Frumusanu's study was swift.  Almost immediately, Geekbench, one of the most popular and respected benchmarking sites, conducted its own investigation, confirming Mr. Frumusanu's results, and removed all OnePlus 9 benchmarks from its own charts.[15] Geekbench determined that OnePlus' behavior is "a form of benchmark manipulation."[16]  Other reputable authorities, such as Android Authority, also determined that Mr. Frumusanu's "data is on the mark."  Specifically, Android Authority stated that "[w]e found that the OnePlus 9 series limits the performance" of applications "while older OnePlus phones do not."  Android Authority determined that OnePlus' behavior "could give a false impression to a potential buyer" that the Devices perform faster than they actually do.  In response to this criticism, OnePlus admitted that it

---

[14]     Will Sattelberg, "OnePlus confirms it throttled the performance of 300 popular apps," *AndroidPolice* (July 7, 2021), https://www.androidpolice.com/2021/07/07/oneplus-faces-accusations-of-hobbling-latest-flagships-performance/ (last visited Oct. 5, 2021).
[15] C. Scott Brown, "OnePlus series removed from Geekbench (Update: OnePlus gives statement)," *Android Authority* (July 7, 2021), https://www.androidauthority.com/oneplus-9-benchmarks-1640058/ (last visited Oct. 5, 2021).
[16] I. Bonifacic, "OnePlus confirms its lastest phones throttle the performance of popular apps," *Engadget* (July 7, 2021) https://www.engadget.com/oneplus-9-pro-throttling-200547997.html (last visited Oct. 5, 2021).

had engaged in the behavior outlined above.   On July 7, 2021, OnePlus released the following statement:

> ***Following the launch*** of the OnePlus 9 and 9 Pro in March, some users told us about some areas where we could improve . . . ***As a result of this feedback***, our R&D team has been working over the past few months to optimize the devices' performance when using 300 of the most popular apps, including Chrome[.][17]

47.   OnePlus' statement, a product of marketing speak, blows smoke as to the reason for the throttling and confirms that this behavior wasn't added until a post-launch update, "following the launch of the OnePlus 9 and 9 Pro."   As technology publication ARS Technica stated, "[i]t's pretty troubling that the company decided to lower the device performance *after* the phone was released and reviewed by most outlets. Now customers aren't getting what they were expecting."[18]   Other publications agree.   According to the Financial Express, "the bigger issue is that all this happened post launch of the OnePlus 9 and OnePlus 9 Pro through a software update pushed out to these phones. This means early reviews of the OnePlus 9 and OnePlus 9 Pro were based on an entirely different experience."   Moreover, Defendant's statement acknowledges that only it had access to certain knowledge to which reasonable consumers did not.

48.   Accordingly, OnePlus accessed user devices without their permission, taking control of crucial functions and limiting consumers' ability to choose which applications they would like to prioritize.[19]   This demonstrates that OnePlus had exclusive knowledge over material facts not known or reasonably accessible to Plaintiffs and the Putative Class.   Rather than reveal this information to consumers, OnePlus actively concealed this information and throttled consumer devices without their knowledge.

[17] Sattelberg, "OnePlus confirms it throttled the performance of 300 popular apps." (emphasis added).

[18] "OnePlus caught throttling performance on some phones without users' consent, admits later." https://www.financialexpress.com/industry/technology/oneplus-caught-throttling-performance-on-some-phones-without-users-consent-admits-later/2286409/ (September 27, 2022).
Ron Amadeo "OnePlus admits to throttling 300 popular apps with recent update." https://arstechnica.com/gadgets/2021/07/oneplus-admits-to-throttling-phones-after-launch-to-improve-battery-life/ (last accessed September 27, 2022).

[19] Kishan Vyas, "The OnePlus 9 seems to be throttling its performance in many popular apps," *XDA Developers* (July 7, 2021), https://www.xda-developers.com/oneplus-9-pro-performance-throttling-popular-apps/ (last visited Oct. 5, 2021).

49.     Accordingly, consumers did not receive the benefit of their bargain.  Though consumers paid for enhanced capability, what they received instead was a Device containing a Secret Setting that actually limited the Devices' overall performance.  This Secret Setting is not one that applies to only "a handful of apps, but applies to pretty much everything that has any level of popularity in the Play Store, including the whole of Google's app suite, all of Microsoft's Office apps, all popular social media apps, and any popular browser such as Firefox, Samsung Internet, or Microsoft Edge."  In turn, there exists "a large disconnect between the performance that's exhibited in the most popular applications out there and the experience that users will be having within the most popular applications on the market."

50.     Mr. Frumusan's study focused on the Chrome and Twitter apps, but his research indicated that the same throttling resulting from the Secret Setting was enabled for Microsoft Word, Microsoft Excel, Microsoft Outlook, Microsoft Teams, DropBox, Amazon Shopping, Pokemon Go, Uber, Uber Eats, Adobe Reader, Strava, Twitch, Facebook, Discord, LinkedIn, Netflix, VLC, Candy Crush, AirBNB, WhatsApp, Zoom, Instagram, SnapChat, TikTok, YouTube, Mozilla FireFox, and Reddit.  The throttling was also enabled for the built-in settings, launcher, forums, weather, file manager, gallery, and camera applications.  This list is not exhaustive.

## CLASS ALLEGATIONS

51.     Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek to represent a Class defined as all persons in the United States who purchased or leased the OnePlus 9 or OnePlus 9 Pro (the "Class").  Excluded from the Class are persons who made such purchases for purpose of resale, all Court personnel involved in the handling of this case, Defendant, its respective officers, directors and employees, and any entity that has a controlling interest in Defendant.

52.     Plaintiffs Wade, Pacheco, Haine, and Siguenza also seek to represent a subclass consisting of Class Members who reside in California (the "California Subclass" or the "Subclass").

53.     Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

54.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**.  The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable.  Plaintiffs are informed and believe—based upon the publicly-available information discussed herein—that there are millions of class members, making joinder impracticable.  Those individuals' identities are available through Defendant's records, and class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

55.     **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)**.  Defendant has acted with respect to Plaintiffs and the other members of the proposed Class in a manner generally applicable to each of them.  There is a well-defined community of interest in the questions of law and fact involved, which affect all class members.  The questions of law and fact common to the Class predominate over the questions that may affect individual class members include the following:

   a.   Whether Defendant designed, manufactured, advertised, and sold Devices that it knew contained Defects and withheld that information from consumers or purposefully misrepresented the Devices to consumers;

   b.   Whether Defendant designed the Secret Setting to affect the speed, performance, and power of the OnePlus Devices;

   c.   Whether and to what extent Defendant disclosed the effect of the Secret Setting to consumers before July 7, 2021;

   d.   Whether Defendant used the Secret Setting to profit from Plaintiffs and the other class members by inducing them to buy new replacements for their Devices;

   e.   Whether Defendant is subject to liability for fraudulently concealing the material facts from Plaintiffs and the other class members;

f.      Whether Defendant's conduct violated the CFAA,

g.      Whether Defendant's conduct violated the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and other applicable and similar laws of the United States and territories;

h.      Whether Defendant has violated the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*;

i.      Whether Defendant's conduct has violated Cal. Penal Code § 502;

j.      Whether Defendant's conduct has violated any additional federal or state law;

k.      Whether Defendant has been unjustly enriched as a result of its fraudulent conduct, such that it would be inequitable for it to retain the benefits conferred upon them by Plaintiffs and the other class members;

l.      Whether compensatory or consequential damages should be awarded to Plaintiffs and the other class members;

m.      Whether punitive damages should be awarded to Plaintiffs and the other class members;

n.      Whether restitution should be awarded to Plaintiffs and the other class members; and

o.      Whether other, additional relief is appropriate, and what that relief should be.

56.     **Typicality: Federal Rule of Civil Procedure 23(a)(3)**.  Plaintiffs' claims are typical of other class members' claims because Plaintiffs and class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

57.     **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4)**.  Plaintiffs are adequate class representatives because their interests do not conflict with the interests of class members whom they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

58.   **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**.  The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant.  Such individual actions would create a risk of adjudication that would be dispositive of the interests of other class members and impair their interests.  Defendant has acted and/or refused to act on grounds generally applicable to the Class, making injunctive relief or corresponding declaratory relief appropriate.

59.   Injunctive relief is particularly necessary in this case because: (1) Defendant currently maintains a Secret Setting that allows it to override consumer preferences thereby negatively impacting the consumer experience; (2) Plaintiffs desire to purchase products with the same qualities and attributes as Defendant advertised the Devices to have; (3) if Defendant actually manufactured devices with the qualities and attributes as deceptively represented, Plaintiffs would purchase those Devices; (4) but Plaintiffs do not have the ability to determine whether Defendant's representations are true concerning the Devices if they purchases such Devices in the future.  Indeed, Plaintiffs, and putative class members, in the future will likely want to purchase Devices manufactured by Defendant; however, they expect that Defendant will not represent or conceal defects in those Devices.

60.   **Superiority: Federal Rule of Civil Procedure 23(b)(3)**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for class members to individually seek redress for Defendant's wrongful conduct.  Even if class members could afford litigation, the court system could not.  Individualized litigation creates a potential for inconsistent and or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far

fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE COMPUTER FRAUD
### AND ABUSE ACT, 18 U.S.C. § 1030(a)(5).

61.     Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf of the Class and Subclass.

62.     Defendant installed post-launch and after sale a Secret Setting that allows it to override consumers' application preferences and the speed at which those applications operate.  This setting leads to diminished device performance, or throttled performance.  Accordingly, Plaintiffs and class members did not give permission for Defendant to install and maintain this setting onto their Devices—nor could they—as Defendant did not provide material information to Plaintiffs and class members regarding the Secret Setting.

63.     Defendant violated 18 U.S.C. 1030(a)(5)(A)(iii) by intentionally accessing Plaintiffs and class members' Devices—protected computers—without authorization, and as a result, caused damage to Plaintiffs' and class members' Devices by impairing the integrity of those Devices.

64.     Defendant violated 18 U.S.C. 1030(a)(5)(C) by intentionally accessing Plaintiffs and class members' Devices—protected computers—without authorization, and as a result, caused damage to Plaintiffs and class members' Devices by impairing the integrity of those Devices.

65.     Defendant has caused loss to Plaintiffs and class members in real, economic damages. More specifically, consumers were led to believe, based on Defendant's representations, that the Devices are much faster and more powerful than they actually perform because Defendant maintains a Secret Setting that allows it to choose which applications receive priority.  As a result, consumers are damaged because they are not getting the full advertised performance of their phones and have suffered the loss of money in the form of the significant price premium they paid for characteristics— i.e., speed, power, and performance—that they are not receiving.  Plaintiffs and class members additionally suffered loss by reason of these violations, in terms of added expense in operating their

Devices, which have been throttled, or in the purchase of new, unthrottled Devices.

66.     As courts in this District have held, Plaintiffs "may aggregate individual damages over the putative class to meet the damages threshold if the violation can be described as 'one act.'" *See, e.g., In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1066 (N.D. Cal. 2012) (Koh, J.). Here, Defendant's post-launch throttling of the devices constitutes one act which served to reduce the value of Plaintiffs' Devices.  Because power and speed are a significant component of the value of Defendant's Devices, Defendant's Devices are worth less than they would have been absent the throttling.  Accordingly, the aggregated losses that Plaintiffs and members of the putative class have experienced, as outlined in the preceding paragraph, provides Plaintiffs with standing.

67.     Unless Defendant is restrained and enjoined, Defendant will continue to commit such acts.  Plaintiffs' remedy at law is thus inadequate to compensate for these inflicted and threatened injuries, entitling Plaintiffs to remedies including injunctive relief as provided by § 1030(g).

68.     Plaintiffs and the Class also seek all monetary and non-monetary relief allowed by law, including damages and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the Consumer Fraud and Abuse Act.

## COUNT II
## VIOLATIONS OF CALIFORNIA'S UNFAIR
## COMPETITION LAW, Cal. Bus. & Prof. Code § 17200, *et seq.*

69.     Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf themselves and the California Subclass.

70.     Defendant is a "person[]" as defined by Cal. Bus. & Prof. Code § 17201.

71.     Defendant violated Cal. Bus. & Prof. Code § 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

72.     Defendant's "unfair" acts and practices include:

    a.     Knowingly designing, developing, manufacturing, advertising, and selling Devices with a significant Defect that result in the Devices not operating as intended, represented, or advertised under normal usage;

b.   Developing and maintaining a Secret Setting that hide the Defect by throttling Device performance, resulting in the Devices operating at slower speeds than intended, represented, or advertised under normal usage;

c.   Concealing material information from consumers regarding their Devices that were both central and material to their purchasing decisions but which information was exclusively in the possession of Defendant, so that consumers were unable to make informed choices when purchasing the Device;

d.   Volunteering information to Plaintiffs and Class members through advertising that the devices allow for "maximum speed," "25% higher CPU performance," "unprecedented power," "25% performance uplift," and "next level," without disclosing facts that would have materially qualified those partial representations;

e.   Concealing material information from consumers regarding the Secret Setting, so that consumers would not, nor could they know that their Devices were being throttled; and

f.   Using uniform, deceptive business practices such as throttling to slow down Devices, causing consumers to spend additional money to secure alternative devices with faster performance.

73.   Defendant has engaged in "unlawful" business practices by violating multiple laws including the Computer Fraud and Abuse Act, 18 U.S.C. 1030(a)(5)(A) and (C), Cal. Bus. & Prof. Code § 17500, *et seq*. and California common law.

74.   Defendant's unlawful, unfair, and deceptive acts and practices include:

a.   Knowingly designing, developing, manufacturing, advertising, and selling Devices with significant defects that result in the Device not operating as intended, represented, or advertised under normal usage;

1

      b.      Developing a Secret Setting that hide defects and throttle Device performance,

2

                resulting in the Devices operating at slower speeds than intended, represented,

3

                or advertised under normal usage;

4

      c.      Concealing material information from consumers regarding their Devices that

5

                were both central and material to their purchasing decisions but which

6

                information was exclusively in the possession of Defendant, so that consumers

7

                were unable to make informed choices when purchasing the Devices;

8

      d.      Volunteering information to Plaintiffs and Class members through advertising

9

                that the devices allow for "maximum speed," "25% higher CPU

10

                performance," "unprecedented power," "25% performance uplift," and "next

11

                level," without disclosing facts that would have materially qualified those

12

                partial representations;

13

      e.      Concealing material information from consumers regarding the Secret

14

                Setting, so that consumers would, not nor could they know that their Devices

15

                were being throttled; and

16

      f.      Using uniform, deceptive business practices such as throttling software to

17

                slow down Devices, requiring consumers to spend additional money on

18

                replacement devices as a result of the Defect.

19

      75.      Defendant violated § 17200's prohibition against engaging in unlawful acts and

20

practices by engaging in false and misleading advertising and by omitting material facts from

21

purchasers of their Devices.  As alleged more fully herein, Defendant's marketing and sale of

22

Devices, and specifically its failure to inform customers of the negative impact throttling would have

23

on those Devices, violated Cal. Civ. Code § 1750, *et seq*., common law, and other statutory violations

24

as alleged herein.  Plaintiffs reserve the right to allege other violations of the law, which constitute

25

other unlawful business acts and practices.  Defendant's conduct is ongoing and continues to this

26

date.

27

28

76.     Defendant violated § 17200's prohibition against unfair conduct by failing to inform its customers about the Defect in the Devices, engaging in a pattern or practice of concealing those facts and urging its customers to purchase the Devices, thereby depriving those Device owners of the performance of those Devices that were advertised as existing at the time of purchase.  This conduct is substantially injurious to consumers, offends public policy, is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct—crippling Devices that are, in many instances, consumers' lifelines—outweighs any alleged benefit.  Specifically, the utility gained by the existence of the Secret Setting on the Devices was outweighed by the diminishment of the Devices' functionality.  Defendant engaged in this conduct at the expense of its customers' rights when other, lawful alternatives were available (such as providing customers with full information about the throttling and Secret Setting).

77.     Defendant engaged in this conduct to gain an unfair commercial advantage over its competitors, seeking to avoid public knowledge of the Defect in their Devices to avoid damage to its sales or reputation.  Defendant withheld critical and material information from Plaintiffs and class members, competitors, and the marketplace, all to their unfair competitive advantage.

78.     Defendant's business practices, as alleged herein, constitute fraudulent conduct because they were likely to deceive, and did deceive, class members into purchasing Devices when those Devices were defective.

79.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

80.     California law prohibits unauthorized computer access and fraud pursuant to Cal. Penal Code § 502.

81.     As a result of Defendant's Secret Setting on Plaintiffs' and class members' devices, Defendant knowingly accessed and without permission altered, damaged, deleted, destroyed, and otherwise used any data stored on Plaintiffs' and class members' devices.

82.    Plaintiffs and class members did not know that Defendant would throttle Device performance; accordingly, Defendant did not have permission to install on and employ a Secret Setting to throttle class members' Devices.

83.    Defendant accessed and without permission altered and used data on class members' Devices to execute a scheme or artifice to defraud the class members by, among other things, maintaining market share, convincing Plaintiffs and class members to purchase new Devices, and to otherwise ensure that Plaintiffs and class members would not discover Defendant's underlying fraud regarding their omissions and misrepresentations regarding the Devices.  As a result, Defendant violated Cal. Penal Code § 502.

84.    Defendant's Secret Setting led to the deterioration of the Devices and functionality of the Devices as a whole, driving consumers to purchase new Devices who would not have outlaid the additional costs had they known the truth and had Defendant not concealed the Defect.

85.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiffs and class members were injured and lost money or property, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.  More specifically, consumers were led to believe, based on Defendant's representations, that the Devices are much faster and more powerful than they actually perform because Defendant maintains a Secret Setting that allows it to choose which applications receive priority.  As a result, consumers are damaged because they are not getting the full advertised performance of their phones and have suffered the loss of money in the form of the significant price premium they paid for characteristics—*i.e.*, speed, power, and performance—that they are not receiving.

86.    Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs and class members' rights. Defendant's knowledge of the Devices' performance issues and their Secret Setting, put them on notice that the Devices were not as they advertised.

87.     Plaintiffs and class members seek all monetary and non-monetary relief allowed by law, including restitution and all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

88.     Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law, if, for instance, damages resulting from their purchases of the Devices is determined to be an amount less than the premium price of the Devices.  Without compensation for the full premium price of the Devices, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

89.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to cease use of its throttling practices or to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiffs and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

90.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested.

**COUNT III**
**VIOLATIONS OF CALIFORNIA'S FALSE**
**ADVERTISING LAW, Cal. Bus. & Prof. Code § 17500, *et seq.***

91.     Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf themselves and the California Subclass.

92.     Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Devices, concealed the Devices' Defect, and concealed the throttling capabilities of its Secret Setting.

93.     By its actions, Defendant disseminated uniform advertising regarding the Devices into California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading

within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.* Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

94.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose the Defect and how its Secret Setting negatively affects the power, speed, and capability of the advertised Processor.

95.     Defendant continued to misrepresent to consumers that its Devices were fast, however, the Devices contained the Defect. Had Defendant disclosed these issues, rather than falsely advertising the Devices' properties, consumers would not have purchased or, alternatively, paid significantly less for the Devices.

96.     In making and disseminating the statements alleged herein, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law. Plaintiffs and other class members based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to products sold in those false and misleading advertisements likely amounts to hundreds of millions of dollars. Plaintiffs and class members were injured in fact and lost money and property as a result.

97.     The misrepresentations and non-disclosures by Defendant of the material facts described and details herein constitute false and misleading advertising and, therefore, constitute violations of Cal. Bus. & Prof. Code § 17500, *et seq.*

98.     As a result of Defendant's wrongful conduct, Plaintiffs and the class members lost money in an amount to be proven at trial. More specifically, consumers were led to believe, based on Defendant's representations, that the Devices are much faster and more powerful than they actually perform because Defendant maintains a Secret Setting that allows it to choose which applications receive priority. As a result, consumers are damaged because they are not getting the full advertised performance of their phones and have suffered the loss of money in the form of the significant price premium they paid for characteristics—*i.e.*, speed, power, and performance—that

they are not receiving.   Plaintiffs and the class members are therefore entitled to restitution as appropriate for this cause of action.

99.     Plaintiffs and class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

100.     Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law, if, for instance, damages resulting from their purchases of the Devices is determined to be an amount less than the premium price of the Devices.   Without compensation for the full premium price of the Devices, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

101.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to cease use of its throttling practices or to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiffs and Class members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

102.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested.

## COUNT IV
## VIOLATIONS OF CALIFORNIA'S COMPUTER
## DATA ACCESS AND FRAUD ACT, Cal. Penal Code § 502

103.     Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf of themselves and the California Subclass.

104.     In selling the Devices to unsuspecting consumers, Defendant violated the California Penal Code, Computer Data Access and Fraud Act, Cal. Penal Code § 502(c)(4) which makes liable a person who "[k]nowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside in or exist internal or external to a computer, computer system, or computer network."

105.    In selling the Devices to unsuspecting consumers, Defendant violated the California Penal Code, Computer Data Access and Fraud Act, Cal. Penal Code § 502(c)(7) which makes liable a person who "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

106.    In selling the Devices to unsuspecting consumers, Defendant violated the California Penal Code, Computer Data Access and Fraud Act, Cal. Penal Code § 502(c)(8) which makes liable a person who "[k]nowingly introduces any computer contaminant into any computer, computer system, or computer network."

107.    When Defendant provided Devices to consumers—Plaintiffs and class members— they did not know, nor could they in the exercise of reasonable diligence know, that Defendant would access their Devices by implementing after sale via a Secret Setting that would throttle their Devices. Defendant's July 7, 2021 statement admitting that it accessed their devices post-launch demonstrates that they did so knowingly and with intention.

108.    Because consumers did not know that such a Secret Setting was implemented in the Devices after sale that allowed Defendant to manually override consumers' preference—*i.e.*, throttling—they did not give Defendant permission to access their Devices to alter the data or computer systems on those Devices.

109.    Defendant installed on the Devices to the Secret Setting post-sale as a part of a scheme or artifice to defraud and deceive, because they installed the setting on the Devices instead of informing them of the issues necessitating the Secret Setting.   Instead, Defendant could have informed consumers that there was a defect that needed to be remedied.   Defendant instead chose concealment and to throttle the Devices via the Secret Setting.

110.    Defendant failed to disclose that they were installing on the Devices after sale a Secret Setting to throttle those devices as a means to encourage consumers to purchase the devices, wrongfully obtaining money from those consumers.

111.    By installing on the Devices the Secret Setting, instead of revealing the truth, Defendant disrupted or caused the disruption of consumer services when they improperly and

unlawfully throttled users and class members' Devices.  Plaintiffs and class members did not consent to having their Devices throttled, and had they known that a Secret Setting was installed on their Devices that would allow the throttling of their Devices, they would not have permitted the installation of such a setting.

112.    As a result of Defendant's unlawful conduct, Plaintiffs and class members were damaged in an amount to be determined at trial.

113.    Plaintiffs and the Subclass seek all monetary and non-monetary relief allowed by law, including damages and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the Computer Data Access And Fraud Act.

**COUNT V**
**TRESPASS TO CHATTELS**

114.    Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf of the Class and California Subclass.

115.    California common law prohibits the intentional intermeddling with personal property in possession of another, without consent, that results in either (a) the deprivation of the use of that personal property; or (b) the impairment of the condition, quality, or usefulness of the property.

116.    Defendant impaired the condition, quality, and usefulness of Plaintiffs and class members' Devices, or parts of them, without their knowledge or consent.  Such acts constituted intentional interference with the use and enjoyment of the Devices.

117.    Here, Defendant's post-launch throttling of the devices constitutes one act which served to reduce the value of Plaintiffs' Devices.  Because power and speed are a significant component of the value of Defendant's Devices, Defendant's Devices are worth less than they would have been absent the throttling.

118.    Defendant acted intentionally, because they knew that Plaintiffs and class members' Devices contained a Secret Setting that reduced the performance of the Devices.  Defendant did not have consumer's or class members' consent to install this Secret Setting and to access their Devices.

119.    Defendant engaged in deception to gain access to the Devices through the use of the Secret Setting.

120.    Plaintiffs and class members suffered actual damages as a result of Defendant's actions in an amount to be determined at trial.

121.    Furthermore, Plaintiffs seek punitive damages because Defendant's trespass was committed from wanton or malicious motives, or reckless disregard of the rights of Plaintiffs and the Class, for purpose of concealing the Defect.

## COUNT VI
## FRAUD

122.    Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf of the Class and California Subclass.

123.    At the time Plaintiffs and class members purchased their Devices, Defendant did not disclose, but instead concealed and misrepresented, the Defect, the Secret Setting, and the Devices' speed and performance, as discussed herein, including through incomplete partial representations and failure to disclose central and material information that was exclusively within Defendant's knowledge.

124.    Further, Defendant concealed that it could access the Devices through the use of a Secret Setting, allowing it to prioritize applications over those consumers widely use and prefer.

125.    Defendant affirmatively misrepresented the Devices' benchmark speeds, giving the Devices the appearance of possessing superior speed and processing capabilities in order to disguise fundamental Device Defects.

126.    Defendant also knew that its omissions and misrepresentations regarding the Devices and the Secret Setting were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

127.    Plaintiffs and class members did not know—nor could they have known through reasonable diligence—about the Defect or the Secret Setting.

128.    Plaintiffs and class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

129.    Plaintiffs and class members had a right to rely upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true speed of the Devices and knowledge of the Secret Setting.

130.    Plaintiffs and class members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiffs and class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VII
## FRAUDULENT OMISSION OR CONCEALMENT

131.    Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf of the Class and California Subclass.

132.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Devices.

133.    Defendant, acting through its representatives or agents, delivered Devices to its own distributors and various other distribution channels.

134.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Devices, including through incomplete partial representations and failure to disclose central and material information that was exclusively within Defendant's knowledge.

135.    Rather than inform consumers of the truth regarding the Defect and the Secret Setting, Defendant concealed material information related to the Defect and the Secret Setting.

136.    Defendant omitted this material information to drive up sales and maintain their market power, as consumers would not purchase Devices, or would pay substantially less for them, had consumers known the truth.

137.    Plaintiffs and the class members accepted the terms of use, which were silent on the performance-throttling features that Defendant installed in its Devices.  Plaintiffs and class members

had no way of knowing about the Devices' Defect or that the Secret Setting would throttle their Devices.

138.    Plaintiffs and class members could not have discovered the above information on their own, because Defendant was in the exclusive possession of such information.

139.    Although Defendant had a duty to ensure the accuracy of information regarding the performance of their Devices, it did not fulfill these duties.

140.    Plaintiffs and class members sustained injury due to the purchase of Devices that did not live up to performance representations and the installation of a Secret Setting that throttled Devices without their knowledge.  Plaintiffs and class members are entitled to recovery full or partial refunds for Devices they purchased due to Defendant's misrepresentations, or they are entitled to damages for the diminished value of their Devices, amounts to be determined at trial.

141.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs' and class members' rights and well-being, and in part to enrich themselves at the expense of consumers.   Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor devices.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

<u>**COUNT VIII**</u>
<u>**NEGLIGENT MISREPRESENTATION**</u>

142.    Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf of the Class and California Subclass.

143.    Defendant negligently and recklessly omitted certain material facts regarding the Devices and the Secret Setting.  Defendant failed to warn consumers that their Devices contained material Defects that resulted in the Device not performing as warranted or advertised.

144.    The advertisements and warranties, which were made expressly through uniform representations from Defendant, were material and would have been considered by a reasonable consumer in making purchasing decisions.

145.    Plaintiffs and class members acquired Devices believing they would function as advertised.

146.    As a result, Plaintiffs and class members were directly and proximately injured by Defendant's negligence in failing to inform Plaintiffs and class members of the material Defects in the Devices and the Secret Setting.  Accordingly, Plaintiffs and class members are entitled to damages in an amount to be proven at trial.

**COUNT IX**
**QUASI-CONTRACT / UNJUST ENRICHMENT**

147.    Plaintiffs reincorporate and reallege each preceding paragraph herein and bring this claim on behalf of the Class and California Subclass.

148.    Plaintiffs and class members purchased Devices from Defendant, and those Devices were not as Defendant represented them to be, enticing Plaintiffs and the Class to purchase the Devices.  Had Plaintiffs and the Class known of the Defect, they would have paid less for their Devices and would not have paid for repairs, service or upgrades caused by the Defect.

149.    Accordingly, Plaintiffs and class members were damaged, and Defendant was unjustly enriched by the purchase price of those Devices.

150.    Plaintiffs and class members are entitled to damages in an amount Defendant was unjustly enriched, to be determined at trial.

151.    Moreover, Defendant's conduct was willful, intentionally deceptive, and intended to cause economic injury to Plaintiffs and the Class.  Defendant is therefore liable to pay punitive damages.

152.    In every contract or agreement there is an implied promise of good faith and fair dealing under California law.

153.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law, if, for instance, damages resulting from their purchases of the Devices is determined to be an amount less than the premium price of the Devices.  Without compensation for the full premium

price of the Devices, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated respectfully requests that this Court enter judgment against Defendant and in favor of Plaintiffs and the Class and Subclass, and award the following relief:

a.   Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Subclass, and Plaintiffs' counsel as counsel for the Class and Subclass;

b.   Awarding declaratory relief and enjoining Defendant from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

c.   Ordering Defendant to pay actual, compensatory, and statutory damages (including punitive damages) and restitution to Plaintiffs and the other class members, as allowable by law;

d.   Order Defendant to pay both pre-and post-judgment interest on any amounts awarded;

e.   Ordering Defendant to pay attorneys' fees and cost of suit; and

f.   Ordering such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated:  October 3, 2022                              Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:_____/s/ Neal J. Deckant_____

Neal J. Deckant (State Bar No. 322946)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940

Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com
       slitteral@bursor.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Gary M. Klinger (*pro hac vice*)
227 W. Monroe Street, Ste. 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

*Attorneys for Plaintiffs*